C. H. WILLIAMS *v.* SARAH P. BALL et al.

**Will — Construction.**

When the language of an instrument propounded as a will is plain and clear, it is not permissible to interpolate words in it to limit its operation or make it conditional.[1]

**Same — Surrounding Circumstances May be Looked to.**

In construeing an instrument propounded as a will, the court will look at the circumstances surrounding the testator at the time it was written, but they cannot be held to change the language employed by the writer to express his will.

---

[1]
In construing the powers of a trustee, conferred in a will, the general purpose or scheme of the testator must be looked to, and where the trustee is vested "with full discretionary power" with respect to the trust, and the fund is given him "to control, administer and manage, and to make such

C. H. Williams filed his petition in the Chancery Court of Lauderdale county for the probate, in the common form, of the last will and testament of his son, Dr. Thomas E. Williams, who died in said county in September, 1880. The instrument propounded for probate is in the form of a letter written by the deceased to his father from Ocean Springs, Miss., on the 4th of October, 1875, which is as follows:

"OCEAN SPRINGS, MISS., October 4, 1875.

"If the great Ruler of the Universe in his wisdom and goodness should see fit to remove me from this world of ours, it is my greatest wish and desire that you would take, adopt and raise my little boy, Edward L. Williams; by so doing you will not only confer the greatest of favors upon me, but also upon him and all of his.                 Affectionately,

"DR. THOMAS E. WILLIAMS."

---

investments and disposition of it as he may deem best," and to appropriate the proceeds of same to certain beneficiaries named in the will, the power of the trustee is limited, and he is bound to have regard to the purposes of the trust and to act in accordance therewith. Strong *v.* Cannon, 1 Miss. Dec. 11, and cases cited in note 1.

A codicil to a will recites "that all notes on each of my sons and sons-in-law of which I may die possessed, shall be deducted from the moneys accruing to them or to their children." *Held* as against minor heirs of a legatee whose husband was indebted to the estate in a large sum, said amount being construed as an advance to the legatee under the will. Barnett *v.* Stewart, 1 Miss. Dec. 342, and cases cited in note 2.

No court can decree the reformation and correction of a will. Schlottman *v.* Hoffman, 73 Miss. 188; 18 So. 893.

A paper which does not purport on its face to be a will, and does not contain a dispositive word, in the absence of evidence that it was intended to be testamentary, is not a will. Young *v.* Wark, 76 Miss. 829; 25 So. 660.

Courts can no more supply defects in the execution of a will or codicil than they can add to or subtract from its words. Johnson *v.* DeLome, 77 Miss. 15; 26 So. 360.

A defectively executed codicil cannot control the construction of the prior will. Johnson *v.* DeLome, 77 Miss. 15; 26 So. 360.

A will made in a foreign State will be construed according to the laws of that State. Adams *v.* Farley, 18 So. 390.

Testator died, leaving as his only heirs two half brothers and one nephew of the whole blood, residing in Louisiana, and certain other nephews and nieces and grandnephews and grandnieces living in Texas, and his will provided, "I give, devise and bequeath all the property * * * to all my blood kind in Louisiana and Texas." *Held*, that the word "kind" should be

The appellees, the maternal grandparents of the child, filed several objections to the probate of this instrument, and an issue of *devisavit vel non* was made up and submitted to the chancellor on proof taken in open court.

The proof shows that the letter was written by Dr. Thomas E. Williams at Ocean Springs during the prevalence of yellow fever there in 1875; that he removed to Sherman, Texas, in 1877, and on his way to that place he passed through Meridian and stopped to see his father, appellant, and while there he asked his father for this letter, and made a copy of it, and returned the original letter to his father marked at the bottom, "Copied, August 27, 1877." That on the 5th of September, 1880, Dr. Williams returned to Meridian with the view of making that his future home, and died on the 6th of September, 1880, in Meridian, leaving the child without father or mother; that the child had been living all the time since its mother's death with appellees.

The chancellor held that the instrument was not a valid will and dismissed the petition. From that decree the petitioner appeals.

---

construed to mean "kin," and, as testator only had one relative of the whole blood located in Louisiana, to which the word "all," if he had intended to exclude his two brothers of the half blood, would not have appropriately applied, the will must be construed to include such brothers of the half blood. Lusby et al. *v.* Cobb et al., 80 Miss. 715; So. 6.

The word "heir" in a will is presumed to have been employed in its technical sense, unless there is in the will a clear demonstration that testator used it in a different sense, in which case effect will be given to his intention. Harkleroad *v.* Bass, 84 Miss. 483; 36 So. 537.

Will construed, and word "heirs" held to have been used in sense of "lawful issue." Harkleroad *v.* Bass, 84 Miss. 483; 36 So. 537.

A will giving to testator's wife "all of my H. place * * * also all of my stock that I may have at my demise, after her demise, to go to" another and her heirs, gave the wife a mere life estate in the H. place, as well as in the stock. Montgomery et al. *v.* McPherson, 86 Miss. 4; 38 So .196.

Where the joint will of a husband and wife provided that, in case of the death of either, the property of the first one dying should vest in the survivor, unless the survivor marry again, when the property inuring to the survivor's benefit by the death of the other should be divided equally "between" the survivor and the children of the survivor and the deceased, the survivor did not take one-half of the estate, and the children the other half, but the word "between" was used in the sense of "among." Edwards *v.* Kelly, 83 Miss. 144; 35 So. 418. See also Rector et al. *v.* Alcorn et al., 41 So. 370.

Appealed from Chancery Court, Lauderdale county, Geo. Wood, Chancellor.

Reversed and remanded, April 11, 1881.

*Attorney for appellant, W. H. Hardy.*

*Attorneys for appellee, Nugent & McWillie.*

Brief of W. H. Hardy:

The only question presented by the record is, whether or not the paper presented for probate is the last will and testament of Thomas E. Williams? To determine this, we can only look to the instrument itself. No particular form is required in the drawing up of a will. Any paper is sufficient if it show a testamentary intent. Anderson *v.* Pryor, 10 S. & M. 620.

The theory upon which the chancellor made his decree was, that this was a *conditional* will. That as the yellow fever epidemic was prevailing at Ocean Springs when and where the letter was written by deceased, that he meant "if he should die during the epidemic," etc.

Let us look at the letter and see if it will bear this construction: "If the great Ruler of the Universe in his wisdom and goodness should see fit to remove me from this world of ours." Now the chancellor supplies these words—"during this epidemic" —"it is my greatest wish," etc.

Evidently the testator did not mean this, or he would have said so. The reasonable supposition is, that being in the midst of an epidemic, it directed his mind to the subject of death, and hence the condition he would leave his motherless child in. Evidently he then and there determined to make a testamentary disposition of his "little boy, Edward L. Williams." This view of the question is abundantly sustained by the conduct of the testator in August, 1877, nearly two years after it was written. When he determined to remove to Sherman, Texas, he went by Meridian, stopped over, and while at his father's house, called for the letter and copied it, kept the copy, and handed the original back to his father.

This conduct was inconsistent with the theory of the learned chancellor that this was a *conditional* will; for if that were so, he

would have said to his father, "Give me that letter and I will destroy it, inasmuch as I did not die during the epidemic." But instead, he carefully copied it, and hands it back to his father, showing beyond all question that he intended it as a testamentary disposition of his "little boy."

But again, to whom else should he confide his little boy than to his father, whose wisdom and love have been mellowed by years, and who would lavish them upon the little orphan with all the tenderness and care of a mother, that the lad might become the idol of his desolate household, the sunlight of his declining years, the stay of his tottering steps as they moved down the latter part of life's journey to the grave?

This disposition of the child was doubly wise and reasonable and natural, since it not only conduced to the best interest of the child, but also to the happiness of the grandfather. Hence, the disposition was wise, reasonable, natural, and that construction should be given to the will which would give it this effect.

Again, what reason can be given for supposing that Dr. Williams wanted the appellant to "take, adopt and raise" his little boy *only* in case he died during the epidemic then prevailing? For, we must go further and hold that, if he did not die during that epidemic, but died afterwards, he did not want his father to "take, adopt and raise" him.

Such an inference is wholly foreign to the record, and we are at a loss to conjecture even whence the learned chancellor gathered such an inference.

We refer the court to the following authorities:

As to power of decedent to make testamentary disposition of minor, see Code, § 2095, by *writing* or by will, etc.

Also the following authorities upon the point that any paper showing a testamentary purpose will be admitted to probate, if the requisites of sound and disposing mind are not wanting: Dunn *v.* Bank of Mobile, 2 Ala. 152; Walker *v.* James, 23 Ala. 448; Mosser *v.* Mosser, 32 Ala. 551; Matter of Wood, 36 Cal. 75; Brewer *v.* Baxter, 41 Ga. 212.

As to construction of wills, see Vannerson *v.* Culbertson, 10 S. & M. 150; Tucker *v.* Stites, 10 G. (39 Miss.) 196; Curry *v.* Murphy, 35 Miss. 473; Sorsby *v.* Vance, 36 Miss. 564.

We think that an inspection of the paper propounded for pro-

bate in this case, in the light of these authorities, makes it perfectly clear that it ought to have been probated.

Brief of Nugent & McWillie:

The point upon which the issue *devisavit vel non* was determined by the chancellor in favor of the appellee, was that the letter offered to be probated as Dr. Williams' will, was a provisional contingent disposition only to take effect in the event of his death during the epidemic then raging in the place of his residence. The language employed in the letter, "If the great Ruler of the Universe in His wisdom and goodness should see fit to remove me from this world of our," fully warrants that construction, and plainly indicates that the letter was written in contemplation of some immediate danger and was intended to express·the writer's wishes· in respect to his son, if he did not survive it. If we do not adopt this construction, we have Dr. Williams saying, if he ever should die, or, if he was not immortal, his wishes would be as stated; for death is the common lot of men—the only fixed and inevitable event of their history. Certainly no one intending to make a testamentary disposition to hold good until his death, however remote, would refer to its happening in the language of uncertainty. It would be sure to occur in the course of nature, from old age, if not sooner; and he would say, "on my death," or "at my death," or "after my death," or "when I am dead," or make use of some other of the many equally definite expressions capable of conveying the idea; but, with reference to the absolute certainty of his demise at some future time, would scarcely employ a contingent form of expression indicating a doubt of its occurrence. The expression, "If the great Ruler of the Universe should remove me," etc., at once excites in the hearer the inquiry: When? or, during what time do you mean? so plainly does it convey‚the idea of a limitation to some particular occasion or period. The question only being one of intention on the part of the deceased, if evidence *aliunde* going to show his situation and surroundings at the time the letter was written would be otherwise inadmissible, still the language employed is of such character as to warrant it; for his meaning is left in doubt until we revert to these extrinsic facts. Do not the words, "If the great Ruler," etc., clearly evince the thoughts and emotion of one surrounded by, or about to encounter perils of some extraordinary kind, when they occur *in the*

*letter* of a young man of twenty-five years of age, who might naturally expect, in the absence of any immediate danger, to enjoy a considerable lease of life thereafter. That expression would be natural enough in the mouth of one about to engage in battle, submit to a dangerous surgical operation, or, as in Dr. Williams' case, spend the summer in a fever-infected town; and whenever and wherever such language is made use of, the mind of the hearer at once sets about to inquire what dangerous crisis or emergency creates the mental pressure that occasions it. It involves not only the idea of a probability of death, but within some short time, and from some cause not stated but understood by the persons to whom he wrote. Death being a certainty in the course of time, we cannot use the term probable in respect to it, unless we limit the time.

This much appears from the letter itself, which, as shown by the date, was written more than five years before Dr. Williams' death. When we recur to the situation and surroundings of the writer, there is no room left for doubt as to what he meant. He was a young physician recently established in practice at Ocean Springs, when the yellow fever became epidemic at that place in the summer of 1875. He bravely concludes to face the danger and remain among the people who looked to him for professional treatment, but having never had the disease and knowing its fatal character, he seems to have felt all the apprehension usual in such case, and naturally bethought himself of his son's welfare when he should be no more. In this condition of mind, he addressed to his father the letter read in evidence commending his son to his care in the result of the contingency so solemnly referred to. He meant nothing more nor less than to engage for the child the love and affection of its grandfather in case he fell a victim to the prevalent disease. If it was a disposition of the child in any sense, it was a contingent one upon that event; but we much doubt that he had any idea of removing or authorizing the removal of the child from Mrs. Ball's care. She was its maternal grandmother; he had given it to her on its mother's death, when it was only a few months old; and she had since nurtured it with the fondest affection and provided out of her own means for all its wants. Mrs. Ball states that on the death of her daughter, Mrs. Williams, in 1874, after their return from the grave, Williams brought the child from his father's where it then was, and gave it to her; and

that it has remained with and been cared for by her from that day to this.

Williams shortly after removed to Ocean Springs, and thence to Texas, where he resided until his return to Meridian in 1880. During this long interval he had ceased to discharge toward the child the duties of a parent, and there has grown up between it and its grandmother who did discharge all of those duties, a relation of the closest and tenderest character; one that he could not sever during his lifetime or by will after his death. Although there was no aggravated abandonment of the child on the father's part as in the case of Peyregne *v.* James, Mss. Op. (Op. Book F. p. 82), we take it on the authority of that case that when the father surrenders the custody of his child and with it all parental authority to another, who thereupon takes it as his own, and so cherishes and provides for it, the power is not revokable at his pleasure in after years; that something of respect is due from all judicial tribunals to those feelings of humanity which condemn the rending of such ties without some sufficient cause, as the immoral character, or lack of means of the person having possession of the child. In the case referred to, while it is true the father had abandoned the child, he had never given it to the person claiming it, and was *himself* proceeding in that suit by *habeas corpus* to recover it—the person claiming it being in no way related to it. He was refused relief. In the case at bar there was no heartless forsaking of the child, but it is clear that Dr. Williams did turn it over to Mrs. Ball who is as nearly related to it as any one living; removed himself for a number of years from any immediate association with it; and ceased to provide for its wants. It is very questionable, to say the least, whether he could recover possession of the child if he were now alive, it being in a great measure discretionary with the court to make disposition of the child according to *its* interests; yet although it is thus doubtful whether he could recover the child himself, the court is called on to carry into effect his alleged testamentary disposition in favor of a third person. It cannot be answered that this suggestion is not entitled to consideration on a mere application to probate the letter as Dr. Williams' will, for if that letter does anything, it certainly does nothing more than dispose of the child. So that if the court establishes the latter as a will, it will be at once called on to carry the will into effect. There is no devise or bequest of property, or

anything of that kind in it. It refers solely to the person of the child; and before establishing the writing as a will the court should require proof to be made that Williams was capable of making the testamentary disposition alleged to have been made. The court cannot be required to go through the useless formality of establishing that as a will which may remain forever inoperative, for what Dr. Williams' intentions were in regard to a subject over which he had no control would be rather an idle inquiry. If the court holds that this letter was a valid appointment of the appellant as guardian, under section 1203 of Code 1871, it must also proceed under section 1204 to issue letters empowering him to take possession of the child; and some right superior to that whereby Mrs. Ball claims possession of it, should certainly be shown before such an order is made. Section 2096, Code of 1880, is the same as to the elect of an appointment, though expressed a little differently. The appellant ought certainly not to be armed with the authority of this court until it fully appears that he is entitled to have it, and that such result will be beneficial to its interests; the Chancery Courts being designed in great part to shield such persons from injury, and given powers fully adequate to that end.

The letter itself does not in terms appoint C. H. Williams guardian of the child, nor does it express any dissatisfaction with Mrs. Ball's custody of it. It desires him in a certain contingency to "take, adopt and raise" the child, and Dr. Williams' subsequent conduct goes to show that he did not intend to revoke the gift of the child to its grandmother, but only to bespeak for it its grandfather's protection in case it should need it. For more than five years the child remained with Mrs. Ball, after that letter was written, and no objection was made by anyone so far as we know. It would seem that if Dr. Williams intended to take the child away from her, he would have done so when he removed to the distant State of Texas, and would have given some other expression to that intention than such as is contained in a letter kept secret for more than five years and produced under circumstances a little suspicious, to say the least.

But we insist that if he did intend to devise the child to C. H. Williams, it was contingent upon his death during the epidemic of 1875. He survived that epidemic, and to all appearances had certainly abandoned such intention. The authorities touching such contingent wills are fully reviewed in Magee et al. v. McNeil

et al., 41 Miss. 17, and the rule, that the new occurrence of the event upon which the disposition is contingent operates as a *defeasance,* distinctly observed and laid down. '

We submit that the decree of the chancellor was correct in point of law as well as just and humane to the child and its aged grandparent.

OPINION.—CAMPBELL, J.:

We cannot adopt the view that the letter of Dr. Williams, which is the subject of controversy, was to be operative only in the event of his death during the epidemic prevailing when it was written. It is probable that the danger which threatened him suggested to his mind the propriety of committing his child to the care of his father and induced him to write the letter, but there is nothing in it indicating that it was limited to any particular period, or conditional on anything but the death of the writer, whenever it should occur. It is not admissible to interpolate in the letter words to limit its operation or make it conditional. The form of expression used, implying uncertainty as to an event certain in its character, may be accounted for by the circumstances which occasioned it, and cannot be held to change the language employed to express the will of the writer. That language is plain and clear. It expresses the wish of the writer that his father should "take, adopt and raise" his child in the event of his death. While it is true that the letter must stand or fall as a testamentary act by itself, it is also true that the action of the writer of it, in taking a copy of it in 1877 and returning it to the custody of his father, is a weighty circumstance to show the value attached to it by the writer, and that he intended it to serve a purpose in the future. The writing should be admitted to probate as the will of Dr. Williams, and that is all that we decide in this case.

Whether the appellant, on his qualification as the testamentary guardian, will be entitled to the custody of the child, and can obtain it, is not now presented for decision.

The decree dismissing the petition for the probate of the letter of Dr. Williams is reversed and the letter directed to be admitted to probate, and the cause is remanded to the Chancery Court of Lauderdale county for proceedings in accordance with this opinion.